# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

JAMES LODGE,                                    :
          Plaintiff,                    :
                       :
          v.                                :      C.A. No. 13-741M
                       :
CAROLYN W. COLVIN,                              :
COMMISSIONER OF SOCIAL SECURITY,               :
          Defendant.                    :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

       Plaintiff James Lodge stopped working in June 2002 after he was fired.  From then until

2009 there is no record that he sought medical treatment for any impairment; nevertheless, on

July 29, 2010, he applied for benefits claiming that he had been disabled since he last worked.

After the application was filed, he initiated treatment, ultimately amending his onset date to

November 9, 2010, to reflect the earliest period for which there are records arguably supporting

his claim.  He now contends that he has been disabled since November 9, 2010, because of

bipolar disorder, manic-depressive disorder, major depressive disorder, paranoid schizophrenia,

hallucinations, anxiety, post-traumatic stress disorder ("PTSD"), chronic obstructive pulmonary

disease ("COPD"), back problems and obesity.[1]  He is before this Court on his Motion to reverse

the decision of the Commissioner of Social Security (the "Commissioner"), denying

---

[1] The conditions listed in his application claiming that he had been disabled since 2002 were bipolar disorder, manic-depressive disorder, COPD, paranoid schizophrenia, hallucinations, anxiety and back problems.  Tr. 28, 210. Because the file reflected obesity, major depressive disorder and PTSD, the ALJ also considered those as potential impairments.  Id.

Supplemental Security Income ("SSI") under § 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3) (the "Act").[2]

Plaintiff contends that the decision of the Administrative Law Judge ("ALJ") was infected by errors of law and not supported by substantial evidence because the ALJ did not assign controlling weight to the opinions of Plaintiff's treating psychologist Dr. Joshua Magee but accorded great weight to the examining agency consultant and substantial weight to the non-examining state agency consultants. Defendant Carolyn W. Colvin has filed a Motion for an order affirming the Commissioner's decision. This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the record, I find that the Commissioner's decision that Plaintiff is not disabled legally correct and well supported by substantial evidence. Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 8) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 10) be GRANTED.

## I. Background Facts

Born in 1965, Plaintiff was thirty-six when he stopped working and forty-five as of the amended alleged disability onset date of November 9, 2010. Tr. 16, 21, 181. He graduated from high school and attended college for three years, after which he worked as a waiter fairly consistently until January 2002 when he was hired and trained (spending a week in Italy) for a job in retail sales as a skincare consultant. Tr. 58, 211, 217. This job ended in June 2002, when he was fired; he never worked again. Tr. 210. According to his application, prepared before he

---

[2] Plaintiff also filed an application for Disability Insurance Benefits ("DIB") under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), on July 29, 2010, Tr. 174-80, but withdrew this claim at the May 16, 2012, administrative hearing, noting that he had not met the insured status requirement of the Social Security Act since December 31, 2007, and that there is a gap in treatment from 2002 until approximately 2010. Tr. 13, 16, 38, 405-06.

engaged counsel, he moved in with his mother sometime after he stopped working and she took care of him. Tr. 182, 239-40. There are records suggesting that he lived in Florida for at least part of the time prior to 2009, the date of the first medical records in the file. Tr. 263. In his application, Plaintiff purported to explain this record gap, claiming that the records from his primary physician "have been lost as he has tried to obtain them so he does not know if we will find his medical history going back to 2002." Tr. 207. Inconsistently, in dropping his DIB claim, his attorney represented that "[t]he claimant . . . has not sustained more [treatment] since . . . '02;" in questioning her client, she stated, "you didn't see any doctors between [2002] until, I think, eight/nine years later." Tr. 38, 405-06. In any event, apart from Plaintiff's anecdotal statements,[3] there is no evidence of any disabling impairment prior to the amended onset date, November 9, 2010, even though Plaintiff had not been working for eight years.

The earliest available record is from Roger Williams Hospital, where Plaintiff was treated in the Emergency Department for acute bronchitis in April 2009. Tr. 324-32. Next is the record of primary care physician, Dr. Shahzad Khurshid, who treated Plaintiff from December 7, 2009, until June 9, 2010. His notes indicate that Plaintiff told him he was taking medications for blood pressure, anxiety, heartburn, attention deficit disorder, as well as Vicodin and Soma (a muscle relaxant) for "[l]ow back problems." Tr. 261. At intake, Dr. Khurshid's notes indicate that Plaintiff told him that he had "ch[ronic] back Pain, takes NASID, prn no help," and that an imaging study would not be possible due to lack of insurance, though Plaintiff claimed that older records would support a prescription for Vicodin. Tr. 262. Based on what Plaintiff told him, Dr. Khurshid prescribed Vicodin, Xanax and Adderall; however, by June 2010, Plaintiff had still not produced records and Dr. Khurshid wrote that he "told him that I don't feel comfortable writing any narcotics. He need[s] to find new PCP he agrees." Tr. 265.

---

[3] See, e.g., Tr. 236 ("I've had asthma + mental health issues since childhood.").

Two months later, on August 20, 2010, without the assistance of an attorney, Plaintiff filed applications for both DIB and SSI alleging that he had been disabled since June 1, 2002. Tr. 174, 181.

The first post-filing record is puzzling: on August 27, 2010, the office of Dr. Russell Settipane returned an inquiry from Disability Determination Services ("DDS") for records checked, "Not our patient," while a DDS records request made on October 14, 2010, to Dr. Settipane has a hand note stating, "Do Not Have Any Recds on this Patient."[4] Tr. 267-69. However, there is also a "Physician Examination Report" form apparently signed by Dr. Settipane on October 26, 2010, opining that Plaintiff has asthma/COPD that "will require chronic lifelong treatment" and that he cannot walk or stand for even two hours and is moderately or markedly limited in all of the mental activities listed on the form. Tr. 270-73. Unsurprisingly, the ALJ declined to afford the Settipane opinion controlling weight because it is conclusory, fails to provide disabling limitations, and assesses Plaintiff's ability to work, which is an opinion reserved to the Commissioner; Plaintiff does not question these findings. Tr. 19.

Apart from these records, the only other treatment in the period between the filing of the application on July 29, 2010, and the amended onset on November 9, 2010, relates to Plaintiff's complaints of back pain. First, on October 5, 2010, he went to the Emergency Department of Roger Williams Hospital for lower back pain. Tr. 315. An x-ray ruled out fracture and disc spaces seemed within normal limits. Tr. 319. Plaintiff was sent home with ibuprofen, soma (a muscle relaxant) and tramadol. Tr. 322. On October 23, 2010, he saw chiropractor Dr. Roger Redleaf, who reported that Plaintiff was walking with a limp and forward lean; he provided a

---

[4] Dr. Settipane was queried for treating records because Plaintiff identified him as a treating physician on his application. Tr. 215. Another physician identified by Plaintiff on his application (Dr. Stephen Petteruti) also returned the DDS request for records with the indication, "Never seen in this facility." Tr. 214, 266. There are no treating records for either Dr. Petteruti or Dr. Settipane. The only treating sources listed by Plaintiff that actually had treating records were Dr. Khurshid and Roger Williams Hospital. Tr. 214.

kind of treatment that usually is effective with mechanical low back pain, but it did not work for

Plaintiff. Tr. 363. Dr. Redleaf recommended a diagnostic MRI to see what might be going on.

Id.

To develop the record, on November 9, 2010, on a DDS referral, Plaintiff was sent for a

psychological evaluation with Corrin Champagne, M.A., performed under the supervision of

clinical psychologist Dr. Jorge Armesto ("the Champagne/Armesto evaluation"). Tr. 275-79.

During the interview, Plaintiff claimed that he was first in mental health treatment at the age of

10, that he was sexually and physically abused as a child, that he began to experience auditory

and visual hallucinations just before his alleged onset date in 2002, and that he experiences

depressed appetite, insomnia, anxiety and depression so severe he spends most of the time in

bed. Tr. 275-78. On mental status examination, Plaintiff was neatly groomed, with appropriate

eye contact and good behavioral control, he was alert and oriented to time and place, his speech

was within normal limits, his mood seemed fatigued, and his sustained attention and

concentration were intact; a global assessment of functioning ("GAF")[5] score of 45 was

assigned. Tr. 277-28. Ms. Champagne and Dr. Armesto noted diagnoses of major depressive

disorder, recurrent, severe with psychotic symptoms, PTSD with delayed onset, and rule-out

diagnosis of schizoaffective disorder. Tr. 278. The evaluation also records Ms. Champagne's

---

[5] A Global Assessment of Functioning ("GAF") score of 41 to 50 indicates "serious impairment in social, occupational, or school functioning;" one between 51 and 60 indicates "moderate difficulty in social, occupational, or school functioning." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–5")). However, the Social Security Administration ("SSA") has released an Administrative Message (identification number AM–13066, effective date July 22, 2013) ("SSA Admin Message") that makes clear that SSA will continue to receive and consider GAF in medical evidence.

observations of Plaintiff's apparent physical discomfort, getting out of his seat, stretching and leaning against the wall "in what appeared to be an effort to alleviate physical pain." Tr. 277.[6]

Also on November 9, 2010, DDS sent Plaintiff for pulmonary function tests in light of his claim of COPD; these tests showed no evidence of an obstructive ventilator defect, with forced vital capacity and single breath diffusing capacity all in normal range. Tr. 281. Notably, Plaintiff told the tester that he had not smoked for a year, id., though he testified at the ALJ hearing in 2012 that he has continued to smoke a pack a day. Tr. 35. Two weeks later, DDS sent Plaintiff for a third examination, by Dr. Seok Suh Lee, an internist. Dr. Lee's report records his observation that Plaintiff could not stand up, walk, sit or climb onto the examination table, which he claimed was due to back pain. Tr. 284. Nevertheless, Dr. Lee's opinion is inconclusive: he advised an MRI to diagnose what was going on with Plaintiff's lower back; apparently unaware that the testing had just been done and was all normal, he recommended complete pulmonary function tests. Also unaware of the Champagne/Armesto evaluation, he recommended a psychiatric evaluation to evaluate depression. Tr. 286.

On January 21, 2011, Plaintiff's claim was administratively denied. Tr. 117. Soon after, he engaged counsel. Tr. 123.

The first record of any mental health treatment of Plaintiff is a behavioral assessment at Comprehensive Community Action Program ("CCAP") on March 1, 2011. Tr. 305-12. In this mental status evaluation, Plaintiff was found to be well-groomed, cooperative, calm and appropriate, with depressed and anxious mood and normal speech. Tr. 310. His thought process was intact, hallucinations and delusions were not present, he had no suicidal or homicidal ideation, and he was fully oriented with intact memory, intact general knowledge, but minimally

---

[6] At the ALJ hearing, Plaintiff amended his date of alleged onset of disability based on the date of the Champagne/Armesto evaluation. Tr. 28.

impaired judgment and insight.  Id.  No diagnosis was made, but his current GAF score was

assessed to be 50, with 60 as his highest GAF.[7]  Tr. 312.  At CCAP, Plaintiff also continued to

seek treatment for lower back pain.  In February and March 2011, he saw Dr. Carol Chancro

three times for "unbearable" pain.  Tr. 287-92.  At the last appointment, Dr. Chancro advised

"that he is not a candidate for Vicodin or opioid stronger than tramadol given chronicity of back

pain."  Tr. 288.  Soon after, he switched to the Rhode Island Free Clinic.  Meanwhile, on April

19, 2011, his request for reconsideration of the denial of his disability application was denied.

Tr. 126-28.

　　In April 2011, Plaintiff's new primary care physician, Dr. John Cece of the Rhode Island

Free Clinic, referred him for a spinal MRI and for psychotherapy due to depression with anxiety.

Tr. 294-96.

　　The spinal MRI was performed on April 15, 2011.  Tr. 293.  It revealed a small disc

protrusion that impressed on the transiting right nerve root.  Dr. Cece sent Plaintiff to

neurosurgeon Dr. Stephen Saris who opined that the protrusion is a type that "generally causes

no symptoms."  Tr. 354.  Rather, Dr. Saris found that Plaintiff's pain is a muscular issue and

recommended exercise and weight loss, though Plaintiff did neither.  Tr. 32-33, 354-57.  Dr.

Cece's summary of Dr. Saris's conclusion is unvarnished: "saw Dr. Saris stated nothing wrong

it's in his head."  Tr. 351.  Plaintiff had a brief course of physical therapy from June 22 to July 8,

2011, at which point he was "progressing well."  Tr. 364.  Because the handwriting is illegible it

is impossible to ascertain why this treatment ended a week later.  Id.

　　Based on Dr. Cece's referral for mental health treatment, Plaintiff commenced therapy

with psychologist Dr. Joshua Magee on May 16, 2011.  Tr. 340.  This therapy involved thirty-

five sessions, ending a year later on May 21, 2012.  Tr. 334-38, 340, 373-97, 398-401.  A

---

[7] See n.5 supra.

threshold observation about Dr. Magee's medical records is that every therapy note is headed with a list of diagnoses – PTSD, depression (major) and pain disorder associated with both psychological factor and general medical condition – yet there is no record reflecting that Dr. Magee ever performed a mental status examination or did anything other than supportive therapy. See Tr. 340 (intake interview focused on Plaintiff's self-description as suffering from anxiety and depression).[8]

Dr. Magee's notes reflect several themes that are pertinent to Plaintiff's claim. First, he focused on helping Plaintiff to improve his relationships with family and friends, including Plaintiff's relationships with romantic partners, with several sessions focused on one person and at least one discussion of ways for them to "have fun." Tr. 338, 376, 384-85, 391. Second, the therapy sessions reflect Plaintiff's activities, such as taking his mother to her thrice weekly medical appointments, completing hospital training and taking charge of changing his mother's feeding tube, dealing with negative feelings that might arise during his Thanksgiving meal with his family, going to a party and positive feelings that followed, and going to a bar and avoiding future conflict with someone he met there. Tr. 334-35, 375, 387, 390. Third, the therapy sessions address Plaintiff's worry about how he would live after his mother, by then in poor health, could no longer support him. Tr. 334, 336, 374, 386, 389. He describes his sisters' unwillingness to take him in and the possibility that he might move to Florida to live with a friend; he spends much time discussing his hope that "his persistence will pay off with his ongoing attempt to seek SSI." Tr. 336, 384, 385, 386, 389, 390, 395, 396, 397, 400. Finally, Plaintiff talked to Dr. Magee about managing anger, including his "anger about physicians sometimes suspect that he may be medication-seeking when in fact he is willing to try any

---

[8] Dr. Magee's intake notes indicate that Plaintiff "was alert and oriented x 3 during the evaluation," but there is no record or any other indication of an actual mental status examination. Tr. 340.

treatment that could help with his back pain." Tr. 394. Notably, Dr. Magee's extensive notes make no reference to hallucinations, voices,[9] delusions, seclusion or the inability to get out of bed or leave home. The note from the final session states that "[d]uring treatment, [Plaintiff] showed significant progress in his ability to tolerate the distress that his interpersonal interactions and back pain cause him." Tr. 400.

At Dr. Magee's suggestion, Plaintiff had a consultation with psychiatrist Dr. Patricia Wold on February 28, 2012. Tr. 361. She prescribed psychiatric medication, but Plaintiff stopped taking it because he did not like the way it affected his sexual response. Tr. 361. While there are suggestions that Dr. Wold may have seen Plaintiff more than once,[10] the record reflects only one visit where his response to medication was the only issue covered. Tr. 361. As of the hearing, Plaintiff confirmed that he was not taking any psychiatric medication. Tr. 31, 37.

## II.    Travel of the Case

Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on August 20, 2010, with a protective filing date of July 29, 2010. Tr. 174-75, 181-87, 206.

On November 30, 2010, based principally on the Champagne/Armesto evaluation report, state agency psychologist Dr. J. Stephen Clifford reviewed Plaintiff's records and concluded that his affective and anxiety disorders are severe, resulting in moderate restriction of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace.

_____

[9] At the ALJ hearing, Plaintiff testified that he told Dr. Magee that he was having auditory hallucinations, hearing voices, every night. Tr. 40-41. Yet Dr. Magee's extensive and detailed treatment notes make no reference to this extremely serious psychiatric symptom. See Tr. 44 (medical expert testified that the "symptom of hearing voices is a rather serious symptom and it usually suggests a serious diagnosis").

[10] For example, Dr. Wold's only treating note, for February 28, 2012, states "will see him in 3 weeks." Tr. 361. In addition, Dr. Magee's letter accompanying his RFC opinion states, "he has met [Dr. Patricia Wold] 6 times for medication management." Tr. 371. However, there are no medical records reflecting additional contact with Dr. Wold, despite Plaintiff's testimony that he saw Dr. Wold on an ongoing basis and the ALJ's continuation of the hearing to procure any additional records from both Dr. Wold and Dr. Magee. Tr. 405-06.

Tr. 79-80. Dr. Clifford prepared a Mental Residual Functional Capacity ("RFC")[11] Assessment, opining that Plaintiff retains the ability to "understand most directions but memory is reliable only for simple directions of 1-2-3 steps;" that Plaintiff's memory, attention and concentration were "adequate only for completion of simple tasks," but that "[i]f limited to simple procedures, [he] retains ability to complete a normal eight hour work day and normal work week;" and that while he "would do poorly in a service type position where required to serve general public/customers," he retains the capacity to "accept supervision but would be more effective in role [sic] in which social contact and demands were reduced." Tr. 84-85.

Plaintiff's physical limitations were assessed by an orthopedic file review performed by state agency physician Dr. Anselmo Mamaril, on January 13, 2011. Tr. 69-70, 78-79, 82-83. Despite Plaintiff's reports of severe back pain, Dr. Mamaril noted the absence of any evidence of degenerative disc disease or arthritis, neurological deficits, antalgic gait and muscle atrophy, as well as essentially normal x-rays; he nevertheless found that the pain could be related to obesity and factored severe obesity into his analysis.[12] Tr. 70. He concluded that Plaintiff's RFC is limited by the ability to lift only twenty-five pounds frequently, and to stand, walk or sit for six hours of an eight hour day. Tr. 82-83. The file was also reviewed on January 13, 2011, by state agency physician, Dr. Barbara Cochran, an internist, who concluded that COPD is not a severe impairment based on the normal pulmonary function tests and the lack of treatment or hospital visits. Tr. 70.

---

[11] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 416.945(a)(1).

[12] Accordingly, the ALJ's decision properly factored obesity into her evaluation of Plaintiff's functional limitations. See "Evaluation of Obesity," SSR 02-1p, 2002 WL 34686281, at *1 (Sept. 12, 2002).

On January 21, 2011, Plaintiff's applications were denied initially. Tr. 117, 120. With the assistance of counsel, he requested reconsideration. Tr. 125.

On March 1, 2011, a second state agency psychologist, Dr. Michael Slavit, reviewed Plaintiff's updated records and issued a Mental RFC Assessment that determined that Plaintiff "can understand most directions but memory is reliable only for simple directions of 1-2-3 steps;" that his symptoms "restrict him to routine work . . . but if limited to simple procedures, the evidence does not preclude his ability to complete a normal work day and work week;" and that while he "can accept supervision," he "will not manage within a hectic or crowded setting . . . . In a typical setting he can tolerate brief, superficial work rel[ationships]." Tr. 113-14. On March 30, 2011, state agency physician, Dr. Donn Quinn, performed a file review and noted that Plaintiff suffers from severe obesity, but that his spinal studies are normal and his COPD is non-severe. Tr. 97. His RFC findings are the same as those of Dr. Mamaril, except that he added a limitation on concentrated exposure to fumes, odors, dusts, gases and poor ventilation. Tr. 98-99.

Plaintiff's request for reconsideration was denied on April 19, 2011. Tr. 126-31. His ALJ hearing was scheduled for May 16, 2012. Tr. 150.

In anticipation of the hearing, Plaintiff submitted a Supplemental Questionnaire as to RFC completed on April 23, 2012, prepared by treating psychiatrist, Dr. Patricia Wold, which indicated moderately severe mental limitations in Plaintiff's ability to relate to other people, to engage in activities of daily living, to understand, carry out, and remember instructions, to respond to customary work pressures, perform simple, complex, repetitive or varied tasks. Tr. 359-60. The form does not reveal the basis for the opinion, except that it indicates that no psychological evaluation was obtained. Tr. 360.

Plaintiff also submitted opinion evidence (two letters and an RFC form) from Dr. Magee. On May 4, 2012,[13] Dr. Magee wrote a letter stating, "[w]hile he experiences many symptoms that impact his day-to-day functioning (e.g., insomnia, flashbacks, difficulty concentrating), [Plaintiff's] pain appears to be particularly debilitating." Tr. 362. On May 14, 2012, Dr. Magee completed a Mental RFC listing diagnoses of PTSD, pain disorder, and major depressive disorder and assessing as severe Plaintiff's limitations in his abilities to relate to other people; respond appropriately to supervision, coworkers and customary work pressures; and perform repetitive tasks; he assessed moderately severe limitations in Plaintiff's abilities to understand, remember and carry out instructions and perform simple or varied tasks. Tr. 367-68. Dr. Magee concluded that Plaintiff could not sustain full-time competitive employment. Tr. 369. Dr. Magee's accompanying letter set out his opinion that Plaintiff's back pain and PTSD render him "100% disabled;" it opines that Plaintiff's PTSD is "among the most severe I have encountered in my 9 years of practice." Tr. 370.

## III.   The ALJ's Hearing and Decision

At the hearing on May 16, 2012, Plaintiff's attorney dismissed the DIB claim because Plaintiff's last insured date is December 31, 2007, and there was no treatment until approximately 2010. Tr. 405-06. Plaintiff testified briefly, stating that he could not work due to severe depression and pain in his back, legs and hips, confirming that he was not taking any psychiatric medication and explaining that he left various jobs because he could "blow my fuse" and did not "want to be around people." Tr. 406-09. However, the ALJ continued the hearing because complete treating records from Dr. Magee and Dr. Wold were apparently missing from the file. Tr. 404-06, 409. At the continuation of the hearing on September 7, 2012, Plaintiff's attorney amended Plaintiff's alleged onset of disability date from June 1, 2002, to November 9,

---

[13] This letter is undated. The index for the administrative file lists its date as May 4, 2012.

2010.  Tr. 27-28.  A vocational expert ("VE"), a psychiatric medical expert and Plaintiff testified. Tr. 25-62.

Plaintiff claimed that he 'basically sit[s] in [his] room," "I'd spend most of my days in bed, . . . the shades closed, in the dark," and that he hears voices every night.  Tr. 30, 40-41.  He admitted that, despite the recommendation of Dr. Saris that he needs to exercise to address his back pain, he has not done so.  Tr. 32-33.  Similarly, despite Dr. Saris's recommendation that he lose weight, he gained weight after seeing Dr. Saris.  Tr. 33.  Initially he testified that he does not help his mother with chores, but after the ALJ asked about his mother's serious health issues, he conceded that he takes her to appointments and changes her TPN bag, prepares his own meals and does his own laundry and shopping (though he says he shops at night).  Tr. 42, 44.  Despite claims of disabling COPD and asthma, he admitted that he still smokes a pack a day.  Tr. 35.

The psychiatric medical expert testified that Dr. Magee's diagnoses of pain disorder, major depression and PTSD are not consistent with his treatment record, Tr. 45-46, and that his therapy was supportive treatment to help Plaintiff, including helping him to get Social Security. Tr. 48.  As a result, the medical expert stated, "I really don't know what's wrong with this person."  Tr. 49.  The VE testified that Plaintiff's past work as a waiter was light and semi-skilled.  Based on the evidence, the ALJ posed a hypothetical:

> a claimant capable of work at the medium exertion level, with occasional climbing, balancing, kneeling, stooping, crouching and crawling; . . . avoid concentrated exposure to extreme cold and pulmonary irritants; no unprotected heights or dangerous equipment; [and] a moderate limitation in concentration, persistence and pace, with the ability to . . . understand, remember and carry out simple, routine, one/two/three-step tasks; a moderate limitation in social interactions with only occasionally work-related interactions with supervisors, co-workers and the general public in a non-hectic or crowded work setting.

Tr. 58-59.  In response, the VE testified that Plaintiff's past work as a waiter would be precluded, but that unskilled factory work such as assembly, inspection, or packaging could be performed,

as could unskilled sedentary factory or cleaning work, and that these jobs existed in significant numbers nationally and in Rhode Island. Tr. 59-60. The VE stated that his answer would not be affected by the addition of a moderate limitation in the ability to respond appropriately to customary work pressures, but that the inability to understand, remember, and carry out even simple, routine, one-to-three step tasks would rule out all work. Tr. 60.

On September 21, 2012, the ALJ issued her decision using the familiar five-step sequential evaluation process. Tr. 23. At Step One, she found that Plaintiff had not engaged in substantial gainful activity since November 9, 2010, his amended alleged disability onset date. Tr. 16. At Steps Two and Three, the ALJ found that Plaintiff's obesity, COPD, major depressive disorder, and PTSD were severe impairments, but that they did not meet or medically equal the requirements of the regulatory Listing of Impairments. Id.

At Step Four, the ALJ first made her RFC finding that Plaintiff could do medium work with limits as to occasional postural activities such as climbing, balancing, kneeling and stooping; no concentrated exposure to extreme cold or pulmonary irritants; and no work around unprotected heights or dangerous equipment. She also found that Plaintiff retained the mental RFC to understand, remember and carry out simple, routine, one-to-three step object-oriented tasks, limited to occasional work-related interactions with supervisors, co-workers and the general public in a non-hectic or crowded work setting. Tr. 18. In making these findings, she afforded substantial weight to the state agency physicians and psychologists and great weight to the Champagne/Armesto evaluation report. Tr. 20-21. She did not assign controlling weight to any of the treating sources who provided RFC opinions (Drs. Settipane, Magee and Wold) and assigned little weight to the testimony of the psychiatric medical expert. Tr. 19-21. Noting Dr. Saris's medical opinion that Plaintiff's back pain was in his head and the normal spirometry test

of Plaintiff's breathing, coupled with his admission that he still smoked, she found that his statements concerning the intensity, persistence and limiting effects of his symptoms lacked credibility. Tr. 19. Based on these findings, she concluded Step Four with the finding that Plaintiff could not perform his past relevant work. Tr. 21.

At Step Five, relying on the VE's testimony, the ALJ found that Plaintiff could perform the jobs of cleaner and factory worker, including assembly, inspection and packaging, all jobs existing in significant numbers nationally and regionally. Tr. 22. Accordingly, the ALJ concluded that Plaintiff was not disabled from November 9, 2010, through the date of her decision. Tr. 23. The Appeals Council denied Plaintiff's request for review on September 17, 2013, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## IV.   Issues Presented

Plaintiff argues that the ALJ gave inadequate weight to the opinions of treating psychologist Dr. Magee and erred in affording significant probative weight to the examining and non-examining consultants.

## V.   Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court

would have reached a contrary result as finder of fact.  <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987); <u>see also</u> <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991); <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole.  <u>Brown</u>, 71 F. Supp. 2d at 30; <u>see also</u> <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); <u>Parker v. Bowen</u>, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  <u>Brown</u>, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  <u>Id.</u> at 30-31 (citing <u>Colon v. Sec'y of Health & Human Servs.</u>, 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  <u>Id.</u> at 31 (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  <u>See</u> <u>Avery v. Sec'y of Health & Human Servs.</u>, 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 416.929(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); <u>accord</u> <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  <u>Seavey v. Barnhart</u>, 276 F.3d 1, 11 (1st Cir. 2001) (citing <u>Mowery v. Heckler</u>, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled). Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision. Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001). On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact. <u>Jackson</u>, 99 F.3d at 1095 (citing <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 98 (1991)). The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. <u>Id.</u>

## VI. <u>Disability Determination</u>

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.905. The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 20 C.F.R. §§ 416.905-911.

### A. Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise. <u>See</u> <u>Rohrberg v. Apfel</u>, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 416.927(c). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. <u>Konuch v. Astrue</u>, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 416.927(c)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. <u>See</u> <u>Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must articulate the weight given, providing "good reasons" for the determination. <u>See</u> <u>Sargent v.</u>

Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 416.927(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 416.927(c)(2).

A treating source who is not a licensed physician or psychologist[14] is not an "acceptable medical source." 20 C.F.R. § 416.913; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion to establish the existence of a medically determinable impairment. SSR 06-03p at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the

---

[14] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields. SSR 06-03p, 2006 WL 2263437, at *1.

opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file. Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 416.927(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 416.945-946), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 416.927(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.      The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. § 416.920. First, if a claimant is working at a substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 416.920(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. Id. § 416.920(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled. Id. § 416.920(d). Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled. Id. § 416.920(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled

is warranted.  Id. § 416.920(g).  Significantly, the claimant bears the burden of proof at Steps

One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267

F. Supp. 2d 138, 144 (D. Mass. 2003).

In determining whether a claimant's physical and mental impairments are sufficiently

severe, the ALJ must consider the combined effect of all of the claimant's impairments and must

consider any medically severe combination of impairments throughout the disability

determination process.  42 U.S.C. § 1382c(a)(3).  Accordingly, the ALJ must make specific and

well-articulated findings as to the effect of a combination of impairments when determining

whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured

status for the purposes of disability benefits.  Deblois, 686 F.2d at 79.  If a claimant becomes

disabled after loss of insured status, the claim for disability benefits must be denied despite

disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### C.       Capacity to Perform Other Work

Once the ALJ finds that a claimant cannot return to the prior work, the burden of proof

shifts to the Commissioner to establish that the claimant could perform other work that exists in

the local or national economy.  Seavey, 276 F.3d at 5.  To meet this burden, the ALJ must

develop a full record regarding the vocational opportunities available to a claimant.  Allen v.

Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through

reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive

reliance on the grids is appropriate where the claimant suffers primarily from an exertional

impairment, without significant non-exertional factors.  Id. (exclusive reliance on the grids is

appropriate in cases involving only exertional impairments, impairments which place limits on

an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given RFC or when a claimant has a non-exertional impairment that significantly limits basic work skills. Nguyen, 172 F.3d at 36. In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991). It is only when the claimant can clearly do unlimited types of work at a given RFC that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given RFC indicated by the exertional limitations. Merola v. Astrue, C.A. No. 11-536A, 2012 WL 4482364, at *5 (D.R.I. Sept. 26, 2012).

## VII. Application and Analysis

Plaintiff's appeal from the ALJ's decision is focused on her failure to afford controlling weight to the opinion evidence of treating psychologist Dr. Magee.[15] He also contends that she committed error in the weight given to the Champagne/Armesto evaluation report and the RFC opinions of psychologists Drs. Clifford and Slavitt.

### A. Dr. Magee's Treating Source Opinions

If a treating source's medical opinion is well supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the ALJ must give it controlling weight. Konuch, 2012 WL 5032667, at *4-5. If it is not entitled to controlling weight, 20 C.F.R. § 416.927(c) lays out the factors that the ALJ should

---

[15] Unsurprisingly Plaintiff does not challenge the ALJ's refusal to afford controlling weight to the opinions of Dr. Wold and Dr. Settipane. Dr. Wold's opinion is supported by only one treating note; moreover, it is expressly cabined by the lack of a psychological evaluation. Tr. 360. Dr. Settipane apparently had no treating relationship with Plaintiff. Tr. 266-67.

consider in determining what weight, if any, is appropriate; these include the length of treatment, frequency of examination, nature and extent of the treating relationship, the support of the opinion afforded by medical evidence, the consistency of the opinion with the record as a whole and the specialization of the treating physician. It is Plaintiff's burden to provide evidence to support his allegations of disabling mental impairments. See 20 C.F.R. § 404.1512(c). The ALJ is not automatically required to give greater weight to the opinions of treating sources, like Dr. Magee. See Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991). Rather, the ALJ has the discretion to resolve conflicts between opinions of treating and non-examining sources, see Rivera-Torres v. Sec'y of Health & Human Servs., 837 F.2d 4, 5 (1st Cir. 1988), as long as she gives "good reasons." 20 C.F.R. § 404.1527(c)(2); see also SSR 96-5p, 1996 WL 374183, at *1-2 (July 2, 1996); SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Thus, this Court's analysis must begin with the ALJ's reasons for the limited weight given to Dr. Magee's opinions despite his extensive treating relationship with Plaintiff.

There is no question that the ALJ was aware of and focused on the extensive treating relationship Plaintiff had with Dr. Magee – at the commencement of the hearing, the ALJ acknowledged that Dr. Magee had had at least thirty-one sessions with Plaintiff. Tr. 405. She continued the hearing to get all of Dr. Magee's records and decided to call a psychiatric medical expert to testify because Dr. Magee's opinion "suggests more of an impairment tha[n] was previously thought." Tr. 409. Thus mindful of both Dr. Magee's lengthy treating relationship and strong opinions, the ALJ nevertheless declined to afford controlling weight to the opinions because his treating notes do not support the limitations set out in his RFC and there are no objective records to support his conclusions. Tr. 20-21. Moreover, the ALJ found that his opinions are inconsistent with the other evidence in the record, including evidence that Plaintiff

had not been taking any psychiatric medication and that the only mental status examinations in the record (one performed by Dr. Armesto and Ms. Champagne on November 9, 2010, and the other performed by CCAP on March 1, 2011) were generally within normal limits. Tr. 20-21. Finally, the ALJ notes Dr. Magee's opinion that Plaintiff could not sustain full-time competitive work, which constitutes an encroachment on the ALJ's prerogative to determine the ultimate issue of disability; accordingly, these statements are entitled to no special significance. See 20 C.F.R. § 416.927(d)(1), (3).

While Plaintiff points to Dr. Magee's strong opinion statements about his perception of Plaintiff's impairments, including the somewhat hyperbolic statement that "his [PTSD] to be among the most severe I have encountered in my 9 years of practice" and that his pain appears to be "particularly debilitating," Tr. 362, 370, Plaintiff concedes that Dr. Magee's notes do not contain any mental status examination or other testing or diagnostic technique supporting the extreme limitations in his RFC. Tr. 20-21; see ECF No. 8 at 12 ("Dr. Magee's progress notes did not contain mental status examinations").[16] The point is illustrated by Dr. Magee's intake interview, which incorporated his observations that Plaintiff was alert and fully oriented, cooperative and forthcoming, with appropriate affect, linear and goal-directed thinking, and no suicidal or homicidal ideation – these are "[p]sychiatric signs [which] are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception," 20 C.F.R. § 416.928(b), and are the type of evidence that must support a medical source's opinion of functional limitations. The remainder of Dr. Magee's intake note covers Plaintiff's recitation of

---

[16] Plaintiff criticizes the ALJ's reference to essentially normal mental status examination based on Dr. Magee's failure to perform any. See Tr. 21. However, this critique misses the point – the ALJ was pointing out the inconsistency between Dr. Magee's RFC and the only mental status examinations in the record, one performed by a treating source and the other by a consulting source. See Tr. 276-78, 310-12.

his symptoms. Tr. 340. Unlike psychiatric signs, symptoms are the claimant's "own description of [his] physical or mental impairment" and "are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 416.928(a). Dr. Magee's opinions are not entitled to controlling weight because they are based almost exclusively on Plaintiff's subjective symptoms. Button v. Astrue, No. CA 11-563M, 2013 WL 1419325, at *15 (D.R.I. Feb. 25, 2013) (citing Rodriguez Pagan, 819 F.2d at 3); see also Bailey v. Colvin, Civ. No. 13-057, 2014 WL 334480, at *3 (D. Me. Jan. 29, 2014); Cowdell v. Astrue, Civ. No. 11-30169, 2012 WL 4862776, at *4 (D. Mass. Sept. 28, 2012); Haggblad v. Astrue, Civ. No. 11-028, 2011 WL 6056889, at *12 (D.N.H. Nov. 17, 2011).

Similarly troubling are the inconsistencies between Dr. Magee's notes and other evidence in the record, including Plaintiff's testimony at the hearing and his representations in his application. For example, Plaintiff testified before the ALJ that he spends his time in his room, in bed with the shades drawn, yet during his therapy with Dr. Magee he described an active life, including romantic attachment, attendance at a bar and a party and consideration of a move to Florida to live with a friend. His dissatisfaction with the psychiatric medicine prescribed by Dr. Wold is telling: "Patient found that sertraline affected his sex response and took himself off all meds." Tr. 361. Similarly, Plaintiff describes back pain that Dr. Magee classified as debilitating and the primary basis for his opinion that Plaintiff cannot work,[17] yet Dr. Saris, the specialist to whom Plaintiff was sent to diagnose and treat the pain, told Plaintiff it was in his head. Tr. 351. Even more troubling, Plaintiff told Ms. Champagne, the state agency examiner, and testified

---

[17] The psychiatric medical expert's testimony focused on this anomaly – he pointed out that the diagnosis of "pain disorder" in the heading to each of Dr. Magee's notes reflects a disconnect between the patient's perception of pain and pain caused by tissue damage, yet Dr. Magee's treatment and opinions do not address that condition. Tr. 46-47.

under oath before the ALJ, that he experiences daily auditory hallucinations, yet Dr. Magee never mentions this extremely serious symptom.[18]

In short, I find that the ALJ correctly concluded that Dr. Magee's opinion was based on the information provided by Plaintiff in supportive therapy sessions and not on medically acceptable clinical and diagnostic techniques, leaving nothing to support Dr. Magee's conclusions about Plaintiff's functional capacity. See Button, 2013 WL 1419325, at *15. Further, Dr. Magee's diagnoses are inconsistent with his treating notes, while his treating notes are inconsistent with Plaintiff's condition as he described it under oath for this application. Campos v. Colvin, No. CA 13-216 ML, 2014 WL 2453358, at *15 (D.R.I. June 2, 2014) (appropriate to afford treating source opinion little weight when inconsistent with medical evidence, source's treatment notes and Plaintiff's own statements). There is no error in the ALJ's determination to afford limited weight to Dr. Magee's opinions.[19]

## B. Champagne/Armesto Evaluation Report

The ALJ afforded great weight to the Champagne/Armesto evaluation report, which also was relied on by the two psychologists whose RFC opinions provide the foundation for the ALJ's decision. Tr. 20. Plaintiff contends that this was error because the ALJ cherry-picked from the report, ignoring the opinion that Plaintiff would have "difficulties managing in the

---

[18] These inconsistencies and others caused the testifying medical expert to state, "I really don't know what's wrong with this person, with reasonable medical certainty." Tr. 49.

[19] Plaintiff also argues that the ALJ should have re-contacted Dr. Magee and offered him the opportunity to submit additional clarification. This is simply wrong; the ALJ was not required to re-contact Dr. Magee because the record was adequately developed to allow her to reach a decision. See Morales v. Astrue, Civ. No. 10-397, 2012 WL 287287, at *9 (D.R.I. Jan. 5, 2012); see also Paradise v. Astrue, Civ. No. 10-236, 2011 WL 1298419, at *6 (D. Me. Mar. 31, 2011). Plaintiff does not explain what clarification from Dr. Magee might affect the decision, or how the failure to contact him is prejudicial to the outcome, as he must to obtain remand on this basis. See, e.g., Bard v. Astrue, Civ. No. 12-022, 2012 WL 5258197, at *2 (D. Me. Sept. 28, 2012); Rusek v. Astrue, No. C.A. 06-38ML, 2008 WL 4449654, at *8 n.11 (D.R.I. Sept. 30, 2008).

community and responding appropriately to others" and the GAF score of 45,[20] Tr. 278-79, while crediting the relatively normal findings on mental status. Tr. 276-78. This argument is belied by the ALJ's decision, which refers directly to the Champagne/Armesto evaluation conclusion that "the claimant may have difficulties managing his symptoms in the community and responding appropriately to others." Tr. 20; see Querido v. Barnhart, 344 F. Supp. 2d 236, 246 (D. Mass. 2004) (single GAF score in 41 to 50 range, without more, does not indicate greater-than-moderate mental functional limitations). Because these evaluators had "an opportunity to observe [Plaintiff's] physical condition over three hours of testing, giving the doctor special knowledge of the claimant, and insight into the extent of her [sic] impairments and ability to function," she afforded great weight to their conclusions. Tr. 20. Reliance on this report is not error nor does the decision's discussion of the report leave this Court without sufficient reasoning to determine that the ALJ properly applied the law in her treatment of it. Ramos v. Barnhart, 119 F. App'x 295, 296 (1st Cir. 2005) (consultative examining psychiatrist report consistent with medical evidence constituted substantial evidence); Disano v. Colvin, No. CA 13-707 ML, 2014 WL 5771885, at *12 (D.R.I. Nov. 5, 2014) (despite existence of contrary opinions by treating sources, examining psychologist may receive greater weight when ALJ articulates adequate and supported basis).

### C.      Dr. Clifford and Dr. Slavitt – Non-Examining Consulting Opinions

Plaintiff correctly critiques the ALJ's somewhat skimpy discussion of her reasons for affording "substantial weight" to all of the findings of the state agency sources, stating only that "they are not inconsistent with the medical evidence as a whole." Tr. 21. She does not describe what is the "evidence as a whole" to which she refers. Nor does she discuss why she credited these opinions, which were formed prior to any evidence of mental health treatment – Plaintiff's

---

[20] See n.5 supra.

mental status examination at CCAP, all of his treatment by Dr. Magee and his brief encounter with Dr. Wold had not occurred as of the dates of these opinions.  Accordingly, Plaintiff contends that they cannot be considered substantial evidence of Plaintiff's functional limitations and should not have been relied upon in development of the RFC.  See Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007) (per curiam).  Without them and as a result of her decision to afford "little weight" to the testimony of the psychiatric medical expert who testified at the hearing, Plaintiff says the ALJ left herself to form her RFC in an evidentiary vacuum, which, as a lay person, she is not qualified to do.  Nguyen, 172 F.3d at 35 (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15 (1st Cir. 1996)).

The analysis of this argument must begin with the settled point that, as state agency consultants, Drs. Clifford and Slavit are "highly qualified . . . psychologists . . . who are also experts in Social Security disability evaluation."  20 C.F.R. § 416.927.  Our Circuit has held that an ALJ's reliance on such state agency consultants' opinions is reasonable as long as the source "at least briefly mentions all of the claimant's alleged impairments and states medical conclusions as to each," and thus "suggests that [he] did review the medical file with some care." Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (per curiam); see also Quintana v. Comm'r of Soc. Sec., 110 F. App'x 142, 144 (1st Cir. 2004) (per curiam) (approving reliance on opinions of non-examining consultants who "reviewed the reports of examining and treating doctors . . . and supported their conclusions with reference to medical findings"); Brown v. Apfel, 71 F. Supp. 2d 28, 39 (D.R.I. 1999) (a nonexamining physician's opinions may constitute substantial evidence to support an ALJ's decision).  Here, while the ALJ's discussion of their work is scant, both Dr. Clifford and Dr. Slavit identified the

evidence on which their conclusions were based, Tr. 77-78, 80, 83-85, 105-08, 112-14, rendering them sufficient to support the ALJ's grounding of his mental RFC findings on their opinions.

Plaintiff's argument that Drs. Clifford and Slavit lacked the benefit of Dr. Magee's therapy notes requires a more careful analysis. First, it is important to consider all of the post-opinion mental treatment evidence, not just that of Dr. Magee. That survey starts with the March 2011 CCAP mental status examination that resulted in a largely normal study and the assignment of a current GAF of 50, with 60 as the highest GAF.[21] Tr. 312. It also includes Dr. Wold's treatment note indicating that Plaintiff stopped taking the psychiatric medication she prescribed because of its impact on his sexual response and his admission at the hearing that he was taking no psychiatric medication. Tr. 31, 361. Finally, there is no error in disregarding the hyperbolic conclusions in Dr. Magee's opinion, unsupported by objective clinical evidence and belied by his treating notes that reference Plaintiff's active romantic and social life, as well as his competency at handling the challenging care of his mother.

The ALJ is well-qualified to evaluate such subsequent medical evidence and to conclude that nothing in it detracts from the opinions of the reviewing medical consultants. See, e.g., Anderson v. Astrue, Civ. No. 11-476, 2012 WL 5256294, at *3-4 (D. Me. Sept. 27, 2012), aff'd, No. 13-1001 (1st Cir. June 7, 2013) (no error to rely on non-examining consultants' RFC assessments not based on full record, where ALJ reviewed entire record and reasonably concluded that claimant's status had not materially changed); see Bowden v. Astrue, Civ. No. 11-084, 2012 WL 1999469, at *5 (D.R.I. June 4, 2012) (ALJ entitled to rely on state agency reviewing medical opinion because evidence not considered did not reflect a substantial deterioration in condition). The mere fact that additional medical evidence was added to the record after the reviewing psychologists issued their opinions is insufficient, without more, to

---

[21] See n.5 supra.

warrant remand.  See Quimby v. Astrue, No. 12-CV-428-PB, 2013 WL 5969600, at *8-9 (D.N.H. Nov. 8, 2013).  The ALJ is vested with the responsibility to resolve evidentiary conflicts between the record medical opinions.  See Tremblay v. Sec'y of Health & Human Servs., 676 F.2d 11, 12 (1st Cir. 1982) (per curiam) ("conflict between the personal physician and the medical advisor was for the [Commissioner] to resolve").  While her decision could, and probably should have included more meat, what is there is enough to demonstrate that she properly discharged that responsibility in this case.  I find that her analysis is adequately supported by substantial evidence and based on the application of correct legal standards and recommend that her decision that Plaintiff is not disabled should be affirmed.

**VIII.**   **Conclusion**

I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 8) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 10) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 16, 2014